14959 Tsao v. Captiva MVP Restaurant Partners, LLC. Mr. Rosemargie. May it please the court. My name is James Rosemargie and I want to thank the panel for the opportunity to present our argument this morning. I represent I-10, so like thousands of other consumers in this case and the class that he seeks to represent, used a credit card at PDQ and as a result had his personal financial information and related data compromised. In addition to the questions of standing that are directly at issue in this appeal, the appeal presents a number of questions with answers that are largely self-evident. When consumers trust their private information to a third party and as a result that information makes its way into the hands of criminals, who should shoulder that blame? Is it okay for a male repercussions because you had the good sense to take reasonable steps to protect yourself? Should a consumer have to wait for bad things to happen before acting upon the unwelcome news that his or her data has been stolen? And does the law only protect those who do nothing or does it promote a policy where people are proactive? It does bear mention at the outside. I'm sorry. The only issue that we need to resolve is the standing issue, right? Yes. The basis on which the district court dismissed the complaint. That is correct. That is correct. But it does bear mention because the courts do draw a distinction here. The allegations of the complaint are that hackers obtained unauthorized access to the database containing. If we were here on a 12b6 ruling, or if we were here on a 12b6 dismissal instead of 12b1, you would have some serious trouble with the standard of pleading because the complaint is extremely conclusory in terms of not only the facts but the legal points. Well, at this point, however, we are talking about 12b1 and we're simply... I understand that. Well, that's just what Judge Jordan mentioned. We got one narrow issue here, which is standing. Right. But it does go to the standing, the fact that we are talking here about hackers. This is not a situation where we have a laptop that was stolen or misplaced that happened to, by happenstance, contain personal data or where information that was supposed to be private was inadvertently made public. This is a typical hacking case. It is. There are lots of those. There are lots of those. But there is a distinction between hacking cases where there's still information, like in the medical context, for example, where there are still additional steps that need to be taken for that data to be misused. Whereas here, you've got financial information in the form of credit cards, names, and other identifying information that a hacker can use to create havoc right now. And is there anyone that believes at this point that when a hacker goes to the time and effort and incurs the risk associated with stealing all this data that they don't plan to use it? They're going to sell it. They're going to sell it. They've probably already sold it. I mean, the moment you have your data... You'd be a fool to hack in there and not sell it. That's exactly right. You're going to wind up in prison and you get nothing for it. That's exactly right. And so it makes it very clear that when your data is compromised, it is not a question of whether there is a risk of that data being misused. It means that you're already clearly in the crosshairs and that at some point, your data is going to be used against you if it hasn't already, if it's not already made its way onto the dark web and then sold to hackers who may use it now. Did you articulate in your complaint the theory of injury that was tied to whatever steps your clients would have to take to sort of self-protect from any future problems? We did indeed. We did indeed. Yes, I direct your attention. I'm sorry. Your complaint alleges that as an injury that, for example, Mr. Sal had to go get something like lifelock protection and pay for that because he had no idea where all his information was and that hacking and that selling could happen at any time. So he now had to go out and buy a commercial program that would monitor all of his accounts, his identity, his numbers, et cetera. That was pled in the complaint? Yes, I would direct your attention to paragraph 81 in particular as where we sort of set forth the areas of damage that are alleged and steps that are taken. I will note. Here's what I wrote down, and I may have missed something, that you allege the imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, which required them to take time to correct. And you sought damages for suffering and for privacy, value of lost time, loss of the rewards on the card, stress, and nuisance. Yeah, I don't want to misstate the record. In the instance, with respect to Mr. Sal in particular, he did not take out. Counsel, I don't see the allegation where they went out and bought lifelock or some such thing. That is correct. I'm not suggesting that. What's your best allegation in paragraph 81? That would, in terms of- Which paragraph? Have you got the complaint in front of you? I have the relevant allegations. It would be 81J. 81J? Ascertainable losses in the form of loss of cashback or other benefits as a result of their inability to use certain cards or certain accounts and cards affected by the data breach. And then also K, loss of use of and access to their account funds and associated costs. Because, you know, reward points- We saw that. Okay. That's a far cry from going out and spending money to buy lifelock or do some other thing. But it does indeed have a financial, there is a financial impact associated with that. You use the word loss. Explain that to me. Sure. If you're Mr. Sal, and I think I'm, I hope I'm pronouncing it correctly, but he has his credit information stolen and his identity too as part of this hack. That's correct. And let's say that he's one of those fortunate few who doesn't have his identity or credit card numbers or accounts used. What's the financial impact to him unless he goes out to try to protect himself with some third-party program or the like? Well, in an attempt to mitigate the harm, which is, you know, he went out and closed his accounts, which is, of course, what any reasonable person would do. And it bears mention that had he not closed his accounts, the defendant would no doubt be arguing that he took no steps to mitigate his losses and has no standing for that reason. But reward points, like everybody has a preferred credit card. And the instance of Mr. So, his preferred credit card is a card that both carried a hefty annual fee and that awarded reward points and had other several benefits. He could not use that card for several days because he closed his account, had to use other cards to make purchases, and lost the benefit of that. The reward points, there is a discrete and concrete financial value of each point that's admittedly. It's not that he lost the ability to obtain reward points generally, because he could have opened up a new credit card account with the same merchant under the same terms and conditions. It's that he lost the ability to use the card and get reward points through a certain number of days, a period of time? That's correct. That's correct. It's, you know, a fairly short period of time. But there is a period of time where he's not able to accrue these points. Furthermore, the card that he used carried a $450 annual fee. So, there is a, you know, a daily, if you just do the math, there is a daily cost associated with maintaining this account and having that account. And for the days that he was unable to use it, he's basically paying for something that he doesn't have access to. And courts have recognized that the loss of reward points and the, you know, being unable to access your funds do indeed support standing. Even if you weren't going to use the points or access points or use funds? Well, I mean, at this point, we're getting really into a lot of factual questions that Well, no, let's talk. Let's talk. Well, I know you're at the pleading stage, but if you are denied your funds, let's say you, let's say a bank proactively closes your account and within hours on your request and opens up a new account for you and you've lost access to your funds for three to four hours. Is that Article III injury? How would you access it, though, without having another card that you could You can. It's you've lost it for three to four hours. And I'm asking you if that's Article III injury. I mean, there is, in fact. You go to the you go to the branch and they give you a temporary card, which banks used to do. I don't think they do it anymore. But they used to give you a temporary debit card until you got the other one in the mail for a new account or a closed account. I understand. There is, nevertheless, a quantifiable loss associated with the period of time you can't use that card. What's the quantifiable loss? It's whatever the, you know, the annual fee is divided by the period of time you can't use it. I mean, part of the part of it is you're going to get recharged those days when you open up the new account. I'm sorry, pardon? OK, let's say let's say I open up the same credit card account with a 450 dollar annual fee today. OK, yes, I use it tomorrow at PDQ. The day after that, there's the hack. I pay my annual fee on the day that I open the account. That's correct. I read, I close that account. They reopen an account. I have to pay the 450 again. Well, no, no. Of course not. It carries all the way through. Sure. So where's the injury? But there is there is a period of time where you're not able to access it. You're talking about a period of time when you couldn't use the card. That's correct. That's it in a nutshell, isn't it? That's correct. And there is a dispute. I think we understand that point. Loss of use for a period of time. That is correct. And the inability to accrue reward points during that time. The trial court dismissed that as trifling, saying, you know, basically it's not enough money for the court to care about. Not enough injury, in fact. Right. But that, number one, the suggestion that having your data stolen is trifling. We understand that. That should shake us all to the core. But more importantly, it runs right into the rule 23. I mean, that's the whole reason rule 23 exists, which is to help people vindicate these small losses. So there shouldn't be a question of whether it's enough, whether it's $0.50 or $50,000. There is, in fact, a quantifiable loss associated with this. And the court should recognize it and provide a statement. All right. Thank you very much. Thank you. Ms. Borland. May it please the court. My name is Marie Borland. I represent the APELE, which I will refer to as PDQ, along with my law partner, Robert Schimberg. In this case, effectively what the plaintiff is asking is for this court to be the first circuit court in the country to say that whenever there's a data breach, whenever there's a hacker, ipso facto, per se, there is an injury, in fact, for purposes of Article III standing. No circuit court in this country has ever said that. Or let's talk about the loss of use theory. If your accounts are blocked, and I know this is not this case, but we have to write an opinion. So it's not just a result in the case, but how it's written and what legal principles are set out in it. So someone like Mr. Sal has his account blocked. Let's say that there is suspicious activity in his bank account and his credit card account, and both the bank and the credit card company close down or freeze the accounts without him requesting it. They just do it. And he loses access to those funds, both credit and cash, for a week while he's protesting. Is there Article III injury? Your Honor, you made a very important point there, and there is a distinction. You identified suspicious activity. Had there been suspicious activity on his account, we might have a different case. But he doesn't lose any money, because whatever activity there is, the bank or credit card company nullifies by crediting the account. So he's not out a single penny. He is without access to his credit card and his bank account for a week, in my hypothetical. Is there Article III injury? There is not Article III injury. Okay. A month, Article III injury? If there's no loss, if there's no injury, in fact. He's unable to use his money. Your argument is it's speculative. It's speculative. And again, Your Honor, I think this case is so, the facts of this case are so important, and we haven't really gotten to the facts yet. Loss of use in tort law is generally a compensable injury. So when you get to things like mitigation costs, loss of use, when the courts start talking about those types of losses in the context of a data breach, they've already gone to step one. They've already said, okay, is there an actual injury, an actual theft or, identity theft or fraud? Or is there a certainly impending identity theft or fraud? If you can meet one of those hurdles, then you go to step two, which is what Your Honor is asking. Okay. You've now alleged that something actually happened. You see something on your credit card. Someone's tried to open up an account in your name with a social security number. The bank has called you and said, we're going to freeze your account because there's been suspicious activity. You've received all these charges. That is an actual identity theft. So you can meet Article III standing for that. If you, there's that, I forget what credit card company it is, that a young lady is walking through an airport or a train station, and on the big board where the flights or the train times are, it says, you know, have you bought two of these items for the same price? And you click on your phone, which sends you the message, and you say yes or no. And if the answer is no, the credit card company takes care of it. If you suffer a breach, but you don't suffer any financial harm, is there Article III injury? Your Honor, and we've thought all these questions through, and this particular question I, I, I suspected will come out. I would say we don't have to get there in this case. I know that. If, I will tell you, some courts have said yes, and some courts have had, said no. In the Torres case. That doesn't help me a bit. Well, but the circuit. So I'm asking you, whether or not, if there is a breach, but no financial harm incurred, the cardholder, the account holder is recompensed completely, is there Article III injury? We would say, we would go along with the Second Circuit in the Whelan case, where there was a breach, and there were some charges in Ecuador that amounted to about $2,000, but the plaintiff never had to pay those charges. So the circuit, Second Circuit said no Article III standing. So we would say, no, we think there needs to be more, we need to, we think there needs to be financial harm in addition to the breach, for there to be Article III standing. So for, in a, in a hack case like this one, not only does there have to be a breach, but you have to suffer financial injury as a result of the breach. That is our position, Your Honor, and that is the position of other circuit courts. I know this allegation is not in the complaint, but if Mr. Sowell had decided to protect himself by buying third-party programs to protect his identity and his account, would there be Article III injury? Under the facts of this case? You can make up whatever facts you want. So in the cases where mitigation costs have been determined to be actual injuries, or injuries in fact or purpose, there has first been a... The injury in this case flows from a breach of contract. Whatever injury there is for standing purposes comes out of a breach of contract, does it not? One could argue that. These are breach of contract claims and negligence, whatever. Whatever, whatever injury in fact comes, is suffered by the plaintiff in this case, the named plaintiff, stems from a breach of contract, does it not? As opposed to some constitutional injury. We would presume so, Your Honor, if there were a breach, correct. If there were a breach, then it would be... Because along with a breach of contract, of course, you have to have damage. I'm not arguing against you, I'm just making an observation. Is it not so that whatever injury in fact occurred in this case was generated by a breach of contract? Correct, Your Honor, and in the case of a breach of contract, before you have a cause of action, you'd have to have damages. We're saying that all that happened here, the facts are so critically important in this case, and they're very important with respect to what the other circuit courts have decided. The reason I ask that question is because it's kind of bound up in a 12 point, Rule 12B6 motion to dismiss on the merits. Your Honor, we never get to 12B6 because we... I realize that. You moved for 12B6 also. We did in the alternative, but we wanted Article 3 standing, which we thought we should, Your Honor. And the court decided to dismiss it under 12B1. Correct. Okay. In this case, the plaintiff, Mr. Stowell, made two purchases at PDQ in August and October of 2017. An eight month period goes by. He sees no suspicious activity on his count, no fraudulent charges, no one's calling him, no identities up, no nothing. In June of 2018, PDQ learns of the breach and immediately issues a notice saying some customers... When was the breach... When did the breach occur as opposed to when they notified... So the breach period was... Two breaches. May of 2017. No, the breach period was May of 2017 until April of 2018. So it was almost a year. He used his card during the breach period in August and October, according to the complaint. So well into the breach period, he uses his card. The breach period ends in, I believe it is April. Eight months go by. PDQ learns of it in June, issues a notice immediately afterwards in a couple of weeks, says, we don't know how many names may have been compromised, credit card numbers, we don't know. Some customers' information may have been accessed. But in an abundance of caution, of course, PDQ issues the notice. Mr. Stowell has suffered no misuse whatsoever of his credit card information for eight months. He is tasked under Article 3 with showing two things, an actual injury, which means somebody used his card and he incurred a financial charge, or a certainly impending risk of future injury. How can he show a certainly impending risk of future injury if for an eight-month period, nothing has ever happened with his card? Oh, you're assuming that people who are hacking these accounts and operating on the dark web are operating on a certain sort of business model where they're going to use something over a period of time? Well, Your Honor, but more... That's crazy. More importantly, what I am operating under is precedent from every circuit court in this country. Every circuit court in this country that has addressed a data breach claim, whether it's a hacker, whether it's somebody stole information on a laptop, Article 3 standing rises and falls on whether there's been an access or a misuse of the information. That is the pivotal fact to every single one of these cases. But if I'm trying to get back to this mitigation issue, if you decide I can't take a chance on my accounts being breached or accessed and I am going to go out and buy mitigation protection, you don't think that's a reasonable step taken by a consumer that might constitute injury in fact? It may be a reasonable thing for a consumer to do, but it does not constitute an injury in fact. Why not? I will tell you in the words of some of the circuit courts. In Beck, the Fourth Circuit said, Mitigation costs incurred in response to a speculative threat. Here it would be speculation whether he's ever going to suffer any sort of monetary. You've got to talk to the hacker to find out. Listen, are you really going to access Mr. Sal's account or are you not? If you're not going to do it, then. Your Honor. That's crazy to do. I'm telling you what the circuit courts have said. But I'm asking you whether that makes sense. I think it makes perfect sense because, Your Honor, if you don't limit liability, that's the whole point of Article 3, the injury in fact liability. Injury in fact requirement. There has to be a limitation of liability. If the court were to reverse the dismissal in this case, it will be the very first circuit court in this country to say that evidence of a data breach equals Article 3 injury in fact if you've incurred some sort of mitigation cost. Let me tell you how the Beck court said it. In Beck, there was birth date, social security numbers, et cetera, physical descriptors stolen. The court said it was going to distinguish Remiges and Krotner where Article 3 standing was found because in those cases, at least one named plaintiff alleged a misuse or access of personal information by the theft. The court said, here we don't have that. The court went on to say mitigation costs incurred in response to a speculative threat, i.e. a threat where there's been no showing whatsoever on your card, the bank calling you, of any misuse. If you don't have that, it's speculation. So you have to wait until you get breached? For Article 3 standing, there has to be access or a misuse and we're not making it up. Let me give you a hypothetical. Give you a hypothetical. A simple lawsuit based on breach of contract and you have the sort of, I'll call them nebulous injuries such as in this case. All right? And let's suppose that the contract, within the contemplation of the parties, they anticipated the injury. You follow me? It's within, this is a breach of contract case, so the question becomes whether or not they contemplated these injuries and compensation for them. Do you agree? I understand where your honor is. Okay. So let's just take this very simple case where there is a contract and the parties contemplated the injuries in question and that the party breaching would compensate. Would you have standing? Your honor, it's difficult. Would you have standing? Of course you would. They might not be able to make a $75,000 diversity payment, but they would have standing, would they not? It's a breach of contract case. If there's a breach of contract and there's been an agreement that a breach was damaged. No, I'm making an assumption that you are unwilling to accept for the sake of discussion. The assumption is that when they sat down at the bargaining table, when he went into PDQ, they had a contractual relationship. And part of the contract was if a hacker takes the information, PDQ is liable, like a guarantor. Okay. That's part of the deal. And if a hacker took the information, that would be a breach. Do you follow that? Between Mr. Did you follow that? Yes, I follow you, your honor. All right. And you're telling me that under those circumstances, there would be no standing? We don't know that the hacker took Mr. Sousa. I understand. I'm making the allegation, counsel. Do you agree that there is standing under that hypothetical case? So let me make sure I'm understanding, your honor. There's a PDQ is sitting at the table with a customer and saying, if a hacker breaches our computer system, Part of the bargain when he walked into the restaurant is if a hacker hacks, you owe me money. Would you agree that there is standing? It's very difficult to argue. With a hypothetical, would you agree there is standing for breach of contract? There could be, your honor. Of course, there would be. I'll take your word for it, your honor. Okay. That's why there was a 12B6 motion filed in this case. Right. But in the context of data breach cases in every circuit court throughout the country, if this court issues an opinion reversing, it will be the only circuit court. Are all those other cases breach of contract cases? On a 12B6 level, they may have alleged. No, no, no. On 12B1. I don't know, your honor, but they're data breach cases. It makes a big difference, doesn't it? They're data breach cases. They're cases where there has been an infiltration of a computer system or the theft of information. And what I'm trying to say to the court is we see this in a very simple way, based on the roadmap that has been laid out by every circuit court in this country. If you have not seen an actual misuse or access of your information, you cannot allege an Article III injury in fact. And if you go and voluntarily incur mitigation costs because you're afraid, you have a speculative fear of future theft, you're on your own. That's not Article III standing. And that is from Clapper, and that is from just about every circuit court in the country, and we've cited them in our brief. Okay, let me switch the hypothetical to the medical arena. So you go into a hospital, and the hospital, and you're in a waiting room, waiting for a relative to see a doctor. And through some negligence, the hospital allows some contagious something to be released. And you decide, and the hospital tells you this happened, and we recommend that you might want to get a shot for this. And you go out and you get a shot that you have to pay for to protect against any contagion. Is there Article III injury? Even though you haven't incurred the disease? So it's interesting that Your Honor brings that up because in the Pisiota case, where there was standing, it was the one outlier case. The court said, well, we're gonna liken Article III standing in a data breach case to a toxic tort exposure, a medical implement case. The courts have criticized the Pisiota case for that proposition, saying that data breach cases cannot be compared to toxic tort, medical implement, that type of case. It is a different animal. Why is that? Because you have in the toxic tort scenario, you have medical monitoring as a recognized compensable form of injury and damages. What's different in those cases, you don't know whether you're going to be struck with a disease, but you have the risk of it. And you need to protect against it because you don't know what the future brings. And so you have monitoring. You go see a doctor every year. You get certain tests done every year to make sure that you're okay. If those are compensable in the tort arena, what's the difference here? I will tell Your Honor the difference, having handled toxic tort cases. The moment you are exposed to a toxic substance, you have suffered an injury, in fact, under toxic tort law. The moment you use your credit card at a place of business, and you don't even know whether the hacker has accessed it, and you have not suffered any harm whatsoever, you haven't seen it on your card, bank's not calling you, you have not suffered an injury, in fact. That is the difference. Toxic tort case, there's an injury. Data breach without evidence of a misuse or access, there is no injury. That's the difference for purposes of Article 3. Thank you very much. You've got four minutes left, Mr. Rosemargin. Thank you. We have here, to some extent, a conflation of immediacy of risk with immediacy of result. As a matter of fact, the moment that your data is compromised, you have, then, an immediate risk of harm that can support standing under Spokio. It is a concrete and real threat that, actually, it's more of a promise at this point, knowing what we know now about what hackers do with this data. So there is no need to speculate  or will be misused. You have a problem. The moment that you learn that your data has been accessed by hackers and you need to do something to address it. We should not pretend, by the way... Suppose the contract between the parties didn't call for that injury at all. Zero. Just a minute. I'm sorry. And suppose, under your negligence count, that there's no duty. Are you suggesting that... I'm assuming... You've got to breach a contract claim. Whatever damages you've got arise out of the breach of contract claim. And let's suppose that it does not cover this kind of loss at all. Just make that assumption. And neither does the negligence count. Make that assumption. Then you don't have any... You don't have any... You have no case, basically, but you have no injury from what you've alleged. Well, I mean, if the contract expressly carves out anything of that sort... I'm making the assumption the contract does not cover the loss. And neither does the tort law, Florida law of negligence, doesn't cover that. Let's assume so. And you come in here, you don't have any standing to make any claim, do you? Well, I mean, under that hypothetical... Under that hypothetical, you would lack standing. But that's not the facts that we're... Then your argument has to be that whatever loss you have, whatever injury you suffer, came out of the contract. Isn't that your argument? It certainly flows from it, but where the... It comes out of it. It was part of the bargain. Intrinsic in that bargain is that they're going to keep the data safe. That's what you alleged in the complaint, that it was part of the bargain. Absolutely it is. Okay. Absolutely it is. But we ought not pretend that the only risk that comes from having your data compromised is the risk of unauthorized transactions. Hackers are increasingly creative in the way that they use these things that they uncover in these breaches and can use them in ways to wreak havoc with people's lives. There was an instance... There's a scam that goes around where people will take passwords that they've gleaned from prior breaches and use that to send something to people saying, I know your password is this. I also know these things about you, and if you don't pay me, I'm going to release this information to the masses. I've had people contact me getting these things and being concerned, and it's jarring. And it doesn't have anything to do with... There's no financial consequence to that. But there's more immediacy, if you will, from that sort of a scenario because at least there you've been contacted by someone who has your personal information and wants to use it legitimately. That is true. But the thing I want to point out about that, that information came from the LinkedIn data breach, which happened in 2012. These things are just starting to come to light in the last year or so. Hackers sit on this stuff. The fact that you haven't seen a financial impact from something right away doesn't mean that you're not going to. As a matter of fact, it's likely that it will manifest itself much longer later in time, which we've expressedly alleged. Data breach automatically, in and of itself, constitute Article III injury? It certainly can. Not can, does it? If you have a data breach case with nothing except a data breach, do you have Article III injury for the individuals whose information was compromised? Absolutely. You absolutely do. And I direct your attention to the Zappos case. But you have to have a claim before you can have any injury, don't you? You've got to have a claim. Of course. Well, it has to come from somewhere. Does it come out of the air? Well, it flows. That's what your argument is. Your argument is you had a hacker, therefore you have a claim. Well, what it stems from is the fact that your data is now in the hands of a hacker. I understand. I was trying to throw you a softball. Understood. The softball is that you've alleged breach of contract. And you've alleged that the parties, in so many words, entered into a bargain when Sal went to the restaurant, that if this information is hacked, you have breached our agreement and you've got to compensate me. That's your case? That's correct. Okay. Thank you very much. Thank you both very much. We appreciate it. Thank you. Our last case is number 18-1.